Filed 3/21/14  P. v. Guerrero CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>STEVEN ASENSIO GUERRERO,<br><br>    Defendant and Appellant. | B244382<br><br>(Los Angeles County<br>Super. Ct. No. TA 118357) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Arthur M. Lew, Judge.  Affirmed with modifications and directions.

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Idan Ivri, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Appellant Steven Asensio Guerrero challenges his conviction for first degree murder and attempted willful, deliberate, and premeditated murder. We affirm, but we will modify the judgment to reflect a proper court operations fee.

## PROCEDURAL HISTORY

Following a jury trial, appellant was convicted of one count of first degree murder (Pen. Code, § 187, subd. (a)),[1] and one count of attempted willful, deliberate, and premeditated murder (§§ 187, subd. (a), 664). For the murder count, the jury found true a special circumstance that appellant committed the murder in the course of a robbery (§ 190.2, subd. (a)(17)) and found true an allegation that appellant personally and intentionally discharged a firearm resulting in the victim's death (§ 12022.53, subd. (d)). For the attempted murder count, the jury found true an allegation that appellant used a deadly weapon (a shank) (§ 12022, subd. (b)(1)) and caused the victim great bodily injury (§ 12022.7, subd. (a)). As to both counts, the jury found true an allegation that appellant committed the offenses for the benefit of, at the direction of, and in association with a criminal street gang. (§ 186.22, subd. (b)(1)(C).)

Appellant was sentenced to a total of 44 years to life in prison plus life in prison without the possibility of parole, which included 25 years to life for the firearm enhancement in the murder count, plus life in prison without the possibility of parole for the special circumstances conviction, and 15 years to life for the attempted murder count in conjunction with the gang enhancement, plus one year for the deadly weapon enhancement and three years for the great bodily injury enhancement. The gang enhancement for the murder count was stayed. (§ 654.) Appellant timely appealed.

## STATEMENT OF FACTS

### 1. Count One: Murder of Dominique Dunn in May 2008

In May 2008, 19-year-old Dominique Dunn lived with his mother Yvette Matthews in an apartment complex on 72nd Street in the City of Paramount. He was not a gang member, and his mother did not know of any trouble he had with anyone in the

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

2

neighborhood. Dunn got together daily with his best friend James Simpson, who also was not involved in gang activity.

Matthews and Dunn knew a man in the neighborhood named Armando Rodriguez, whom they called "Mando." Mando[2] was known as the "neighborhood grandpa" because children would go to his house to "hang out" and he would babysit. He babysat Dunn a few times. In May 2008, he lived downstairs from Matthews and Dunn in the same apartment complex. Before that time, he lived next door in the apartment building where Dunn was murdered.

On May 20, 2008, the day of Dunn's murder, Matthews left her house for work at 5:00 a.m. while Dunn was still asleep; he did not have school that day. Dunn and Simpson spent the day together. Simpson had a small "iPod Nano" in his jacket pocket and he thought Dunn had one, too. Matthews came home at approximately 6:30 p.m. to find Dunn and Simpson sitting together outside near their apartment building. Dunn asked Matthews for money, which she gave him, and Dunn and Simpson walked to a nearby market. Matthews went into her apartment.

Albert Turner lived nearby. On the day of the murder, he had returned home from work around dusk and saw two African-American men, apparently Dunn and Simpson, emerge from an alley, cross 72nd Street, and approach a nearby apartment building. He thought they looked familiar, but they wore hoodies and he could not be certain if he knew them.

At around the same time, Mando was working on his car and saw Dunn on the street in front of his apartment.

Dunn and Simpson passed through a wrought iron gate of the building where the shooting would occur; Dunn sat on the stairs while Simpson stood against a wall. Simpson noticed a Honda pass back and forth on the street in front of them. On the car's third pass, it stopped in the middle of the street and two Hispanic men exited from the front and back passengerside doors. The back passenger walked up to Dunn and

---

[2]     We refer to Rodriguez as "Mando" for clarity only and intend no disrespect.

3

Simpson and asked if they "banged," that is, if they were in a gang. Simpson said no. The front passenger stood near the car with a black semiautomatic gun pointed at them. Neither Simpson nor Dunn was armed.

The front passenger was about Simpson's height, but thin, wearing all black clothes and a black hat. The back passenger was "[a] little chubby" and had a shaved head. The back passenger lifted up Dunn's and Simpson's shirts to check for tattoos. He spit in Simpson's face, checked his pockets, found Simpson's iPod, and took it. Simpson was afraid.

At that point, Dunn started to run up the stairs and screamed, "Mando." The front passenger shot him once. The back passenger yelled "C.V.S." or "Compton Varrio Segundo," a gang slogan. Simpson ran around the corner of the building because he thought he would be shot next. He saw the men run back toward the car, but he did not see what they did after that. He found a back entrance to the building and went inside to tell someone Dunn had been shot. He then located Dunn, injured but awake.

Simpson ran to tell Dunn's mother that Dunn had been hurt, and she ran screaming to the building where she found neighbors trying to help Dunn. Dunn was awake when Matthews got to him. When authorities arrived, they ordered Matthews and others to leave the area. Simpson also went home. Matthews learned Dunn later died at the hospital.

Several Los Angeles Sheriff's Department deputies responded to the scene. Arriving first, Deputy Steven Kowaltschuk found Dunn lying conscious at the top of the staircase of the apartment building and being assisted by neighbors. He saw blood on Dunn's chest and near his right pants pocket. He asked Dunn what happened and Dunn told him he was in front of the same building when a four-door, dark-colored car pulled up and three Hispanic men exited. One asked for his iPod, but he refused to give it to him and ran, at which point he heard a gunshot and felt pain in his chest. He saw the car depart westbound while he fled up the stairs and he heard someone yell, "Compton Varrio Segundo." Deputy Kowaltschuk initiated a crime broadcast for three suspects and a dark-colored, four-door sedan.

4

Deputy Cesar Quiroz arrived as paramedics rendered aid to Dunn. He saw Dunn's hat and iPod nearby. He searched the surrounding area and found an expended nine-millimeter casing and bullet in front of the building, but no gun.

Lieutenant Steven Katz arrived after Dunn had been taken away by paramedics. He spoke to Matthews, and she pointed him toward Simpson, who he interviewed the next morning. He showed Simpson a book containing photographs of Hispanic males, but Simpson did not identify anyone. A few days later, police asked Simpson to look at some six-pack photographic lineups, although he did not want to. When he did, he again did not identify anyone. He did pick out someone who looked similar because officers asked him to.

Simpson was eventually arrested for disobeying a subpoena to appear at the preliminary hearing in this case. At that hearing, he initially identified appellant as the shooter, but recanted on cross-examination. At trial, he testified appellant was not involved in Dunn's shooting and the reason he identified him initially was because "that was the man the police thought."[3]

Debra Getts was a resident of the building where Dunn was shot and she witnessed parts of the incident. She was sleeping and awoke to the sound of someone running outside her apartment. She heard a gunshot and someone yell "help" and "Mando, help." She opened her door and saw Dunn grasping his right ribcage area; he told her to call 911. She ran to find Dunn's mother in the building next door, and some neighbors tried to help Dunn before authorities arrived. She later gave a statement to police.

Turner, Dunn's neighbor across the street, also witnessed parts of the shooting incident. At approximately 6:30 or 7:00 p.m., he was watching a basketball game on television when he saw the same two African-American men walking back the way they had come earlier. Later, while he was still watching the game, he heard arguing or a commotion outside. Someone said, "What set you from[?]" Another person responded,

---

**3** Beyond denying appellant was involved in the shooting, Simpson denied seeing appellant's Cadillac at the scene; instead, he saw a dark green Honda.

5

"I'm not from no gang." He then heard a gunshot. He looked outside and saw two Hispanic men, approximately 20 years old, running from the scene. One of them wore a Dodgers hat. He recognized them because they had once visited his home with Mando; on that occasion, he had asked Mando to tell them to leave because they carried blue rags, which Turner believed was gang attire.

On May 27, 2008, Lieutenant Katz received an anonymous tip from Turner, who did not initially identify himself because he was concerned for his safety. Lieutenant Katz met with Turner that day and Turner described what he had seen leading up to the time of Dunn's murder, which was largely consistent with his account of the incident during trial.

A few days later on May 30, 2008, Turner identified a photograph of appellant, who he knew as "Bozo," and said he had seen appellant in front of his house the day before Dunn's death. At trial, Turner thought the person in the photograph he had identified was the man in his yard named Bozo, but he could not be sure because the person looked different in the photograph. He denied saying that person was the one he saw running from the scene on the night of Dunn's murder; he claimed officers told him to circle the photograph and write down the name "Bozo."

After interviewing Turner, Lieutenant Katz interviewed Mando, who provided addresses for appellant and another suspect, Gilbert Mojica. During his interview, Mando told officers appellant had said in the past, "[']I don't like blacks. I don't like niggers[,'] that's what he says all the times he sees them." At trial, Mando testified he knew appellant from around the neighborhood and would invite him over to barbecue or play dominos. Once, he heard appellant say the "F" word with the "N" word, referring to African-American people, but it seemed to Mando appellant "didn't really mean it like in a bad way."

Mando knew appellant was in a gang. He did not know which one, but he had seen appellant's "Florencia" tattoo and he knew that was a local gang. He saw appellant and Mojica together two to three times each week.

6

On June 6, 2008, Deputy Pascual Delgadillo and other officers arrested appellant and executed a search warrant for his residence. In response to questioning at the scene, appellant told Deputy Delgadillo he was in the Florencia 13 gang and he used the moniker Bozo. He had visible tattoos on his arms and a belt buckle with the letter "F" on it. The search uncovered items of gang paraphernalia and a box of live .38-caliber ammunition.

Mojica was also arrested on the same day. In exchange for pleading guilty to voluntary manslaughter and being sentenced to 13 years in prison, Mojica testified against appellant. Mojica associated with Florencia gang members and was known as "Youngster." He knew appellant as "Bozo" and they had been friends since they were 14 or 15 years old. He explained the apartment complex where Dunn was shot was a "hang-out" area in Paramount for Florencia members. He described Mando as an "OG," or old-time gang member who was known throughout the neighborhood, and he said he and appellant would often hang out with him. Mojica and appellant shot pool once with Mando in Turner's backyard.

Mojica feared for his life and his family as a result of testifying. Nevertheless, he identified appellant as the shooter and a Florencia gang member, and he admitted to being the back passenger who checked Dunn and Simpson for tattoos. He identified the driver of the car as another gang member known as "Stranger." He explained on the night of Dunn's murder, he, appellant, and Stranger had been driving around the neighborhood drinking and smoking in appellant's Cadillac when they noticed Dunn and Simpson. Appellant said, "There is some fools right there hanging in front of the apartment. They got some i-Pods. Let's go." Appellant also said, "Let's go jack them." After passing by Dunn and Simpson several times, Mojica and appellant got out of the car. Mojica recognized Dunn, but not Simpson.

Mojica asked Dunn and Simpson, "Where you guys from?" They responded, "We don't gang bang." Mojica lifted up their shirts to check for gang tattoos and searched their pockets. He found their iPods and took them. Appellant was three to four feet away, pointing a black gun alternately at Dunn and Simpson. Dunn yelled, "Mando."

Appellant yelled, "Compton Varrio Segundo" and shot Dunn once as he tried to run up a flight of stairs. Mojica and appellant ran back to the car, which had moved further down the street during the confrontation. Mojica was certain he had taken Dunn's iPod, although it was found at the scene. Mojica and appellant intended to sell the iPods, and Mojica gave them to appellant.

Mojica was interviewed at the time he was arrested, and a portion of that interview was played for the jury. In the interview, Mojica identified appellant as the shooter, which was consistent with his trial testimony, but otherwise the account of the shooting he gave to officers differed in certain details from his trial testimony. Those differences form the basis for one of appellant's contentions on appeal, so we will discuss them in more detail below.

A Los Angeles Sheriff's Department criminalist analyzed the nine-millimeter bullet and expended cartridge case found at the scene. She determined they were consistent with each other, but she could not say for certain whether they originated together from the same cartridge.

An autopsy on Dunn revealed an entrance and exit bullet wound in his abdomen and grazing wounds on his arms. The bullet penetrated or grazed his kidneys, spleen, pancreas, aorta, liver, and small intestine before exiting his body. The bullet flew from left to right, front to back, and upward. The wound was fatal because of the number of organs hit, and Dunn died in surgery, although without surgery he would have bled to death within hours.

## 2. Count Two: Attempted Murder of Inmate Dominic Walker

In November 2010, appellant was an inmate in the Men's Central Jail in Los Angeles. He and an African-American inmate named Dominic Walker were "trustees" who had greater freedom to move around the jail in exchange for doing chores, such as cleaning. Individuals were typically selected as trustees for their influence over other inmates so deputies could use them as liaisons during gang tensions. Trustees could leave their cells, walk around the different floors of the jail, and talk to other inmates. Trustees were segregated by race, so Walker would have only worked with African-

8

American inmates and appellant would have only worked with Hispanic inmates. At the end of a trustee's shift, he can shower apart from the general population.

At around 9:20 p.m. on November 4, 2010, Los Angeles County Sheriff's Department custody assistant Patricia Cristales was working in the 2400 block of dormitories in the jail when she heard a loud yell from the trustees' shower area. She saw Walker walk out of the shower area and approach the officers' station. Appellant and another inmate named Rivera appeared to stab Walker from behind five or six times, although Cristales could not see weapons in their hands. Unarmed, Walker appeared to be in excruciating pain and had blood on different parts of his body.[4] Cristales yelled, "Stop fighting," but appellant and Rivera did not comply. Appellant and Rivera stopped the attack when backup deputies arrived.

Deputy Andrew Lyons responded to the attack on Walker within 10 seconds of Cristales reporting it. He saw Walker covered in blood from multiple puncture wounds. When he approached Walker, Walker pointed toward the shower area behind him. Deputy Lyons saw appellant and Rivera run from the shower area toward the toilet of a nearby "rec" room, yelling "Puro sur trece," a chant used by southern Hispanic gang members. Another Hispanic inmate named Mejia was lying down in front of the officer's station. Deputy Lyons knew Mejia, Rivera, and appellant were all Southsider gang members.

Deputy Lyons followed appellant and Rivera to the toilet area and ordered them to lie down on the ground. They did not immediately comply; instead, Deputy Lyons heard clanging like someone threw an object into a metal toilet and flushed it. Another deputy, Ayub Manjra, saw Rivera pass an object to appellant, who then dropped something metallic into the toilet and flushed. Appellant and Rivera then lay down on the ground, as ordered. Rivera appeared to have been in a fight, with bruises and redness on his body and blood on his face, and appellant had injuries consistent with being in a "brawl."

---

[4] Rivera was five feet six inches and 169 pounds; appellant was six feet two inches and 260 pounds; and Walker was around six feet six inches and 340 pounds.

Deputy Manjra retrieved two jail-made shanks from the toilet, which were consistent with sounds he heard from the toilet. The larger shank was about five inches long.

Immediately after the incident, Deputy Lyons spoke with African-American trustee Montay Harbin. Deputy Lyons found Harbin and another African-American trustee locked in the 2400 tier module after the attack. Harbin believed Mejia had locked him in after falsely telling him a black inmate in the module had a problem and needed immediate help. By the time Harbin discovered no one needed help, Mejia shut "B" row gate and locked him in. Harbin heard yelling from the shower and saw Walker running out, followed by appellant and Rivera.

When he testified at trial, Harbin denied telling Deputy Lyons that Mejia had locked him in the module after falsely telling him another inmate needed help. Instead, he said he closed the gate himself when he entered. He also denied telling Deputy Lyons he saw Walker screaming and running out of the shower, followed by two male Hispanics. He admitted he saw Walker come out of the shower bleeding.

Walker suffered six or seven wounds to his back, three to five wounds to his chest, and two wounds to his arms and shoulders.[5] Immediately after the attack he had difficulty breathing and his eyes were glazed. He had to be taken to the hospital and treated.[6]

### 3. Defense Case

Appellant testified. He admitted he was a member of the Florencia 13 Jokers clique and he was named Little Bozo after his father, who was known as Bozo when he was active in the gang years earlier. Appellant denied committing crimes with the gang or hitting up rival gang members, and his role in the gang diminished when he got a full-time job in 2008. He had friends inside and outside of the gang, including African-Americans.

---

[5] Ten photographs of Walker's injuries were introduced at trial.

[6] The prosecution also called a gang expert witness, but because no issue is raised with regard to the gang allegations, we omit that witness's testimony.

As for Dunn's murder, he testified he knew Dunn from elementary school and denied shooting him. On the day of Dunn's death, he drove his Cadillac to his job at a cleaning company and got off at 4:30 p.m. Around 5:00 p.m., he went with his girlfriend and their infant son to a furniture store to make a payment on a line of credit. Due to a computer problem, they went to another branch of the furniture store and made the payment at 7:05 p.m., and then returned to the first store to buy a fan. They then went to a birthday party for his cousin in Pico Rivera, where they stayed until 9:00 or 10:00 p.m.

Appellant's girlfriend and several of his family members corroborated appellant's alibi testimony at trial. Of note, however, appellant's aunt, who hosted the birthday party, learned of appellant's arrest from his parents, but they did not encourage her to call the police with appellant's alibi. Also, while appellant's father corroborated appellant's birthday party alibi at trial, he previously told police in an interview on May 27, 2008, that appellant returned home from paying bills at 6:30 or 7:00 p.m. on the night of Dunn's murder and had fallen asleep there.

Appellant eventually heard about Dunn's death through neighborhood talk. When he was arrested for the murder, he was carrying an iPod he recently received as a gift. In an interview with police, he said he was in Lancaster at the time of Dunn's death, although he explained at trial he was nervous and confused about the date.

A neighbor, Donnell Tinsley, Jr., testified on behalf of appellant. The night of Dunn's murder Tinsley was in his apartment two units away from Dunn's home when he heard a gunshot. He ran outside and saw Dunn at the top of the stairs. Dunn said, "I was shot." Tinsley saw a dark green Honda with tinted windows in front of the apartment building heading west. Tinsley called the police and waited with Dunn until authorities arrived. At trial, Tinsley recognized appellant as Bozo and had seen him occasionally hanging around the apartments near the area of Dunn's death. Tinsley also knew Mando and would barbecue and socialize with him.

As for the attack on Dominic Walker, appellant admitted he stabbed Walker with a shank. Before the attack, appellant and Rivera entered the shower and were surprised to find Walker there, apparently urinating. They were concerned because they had heard

11

about guards letting inmates out to attack other inmates. Appellant thought he was being set up for an attack, so he got "paranoid," "overreacted," and "panicked," and went after Walker with the shank. Appellant claimed he overreacted and was paranoid because he had been attacked in jail a year earlier, leaving him unconscious and hospitalized. Guards did not come to his aid then, so he believed he needed to protect himself. He was also paranoid because a week prior to the attack on Walker several riots between African-American and Hispanic inmates had broken out.

Appellant claimed he did not intend to kill Walker, avoided stabbing his neck and face, and stopped stabbing him when appellant no longer felt in danger. He also claimed he was the only one in the shower area with a shank. After the attack, he ran into the dayroom and tried to flush the shank. When interviewed after the incident, he claimed he did not know what happened.

## DISCUSSION

### 1. Count One: Playing of Mojica's Police Interview at Trial

Appellant contends the trial court violated his constitutional due process rights by playing for the jury portions of the interview Mojica gave to officers at the time he was arrested because the evidence was unnecessary, cumulative, and confusing. We disagree.

### A. Factual Background

As discussed above, on direct examination at trial Mojica identified appellant as the shooter, admitted to being the back passenger who checked Dunn and Simpson for tattoos, and described details of the incident. On cross-examination, he admitted some of those details differed from the account he gave to Lieutenant Katz and Detective Richard Ramirez during his interview after his arrest. For example, while he identified appellant as the shooter, he did not say a person named Stranger was with them during the time of the murder. He also claimed he and appellant parked appellant's Cadillac across the street from Dunn, and as they crossed the street, Mojica stopped to tie his shoelace while appellant walked up to Dunn by himself and shot him. Afterward, Mojica and appellant ran toward the east, leaving appellant's car parked at the scene.

12

Mojica testified his trial account of the incident was truthful and the details differed from his interview because at that time of his interview he was scared for his life and his family. Defense counsel's cross-examination suggested Mojica had a motive to lie in light of his plea deal, a point counsel reiterated in closing arguments.

After Mojica testified, the prosecutor sought permission to play the audio recording of his interview, arguing Mojica's prior consistent statements, particularly his identification of appellant, were admissible to rebut the defense's suggestion Mojica's testimony was influenced by his plea deal, and Mojica's prior inconsistent statements were admissible for impeachment. Defense counsel objected on several grounds, including that a large portion of Mojica's interview was irrelevant; Detective Ramirez could testify to Mojica's statements without admitting the recording of the interview; Mojica had already testified about his prior consistent statements on cross-examination; and any prior consistent statements were admissible only to rebut later inconsistent statements.

After indicating the prosecutor could not introduce the entire interview under any circumstances, the trial court tentatively prohibited the prosecutor from introducing any portion of the recording because Mojica could be recalled as a witness and the prosecutor could directly elicit the prior consistent statements rather than playing the recording. The court also tentatively denied the prosecution's request to call Detective Ramirez to testify to Mojica's interview statements for the same reason.

In a later hearing, the prosecutor asked the trial court to reconsider its ruling and presented a redacted transcript of the recording reducing the full 50-minute interview to four minutes and five transcript pages. Defense counsel once again objected, suggesting the recording would require calling additional witnesses, including recalling Mojica. Further, while defense counsel did not necessarily take issue with the content of the recording, he believed "it's not necessary in this case because the People have already established . . . [¶] . . . [¶] . . . the prior consistent statement through the testimony of Mr. Mojica, and that all this . . . is cumulative . . . ."

13

The trial court pressed the prosecutor to identify which statements from Mojica's interview he believed were consistent with Mojica's trial testimony, and the prosecutor pointed out the following (all errors in original):[7]

(1) "He [appellant] shot him [Dunn]."

(2) In response to the question, "Did he take the iPod from him?," Mojica said, "I remember because when I was there, but I'm fuck that, that ain't my shit, you know," and "And then I was walking away then with it, fucking running and shit."

(3) He was asked, "You ran, bro, because you were scared. You didn't know that was gonna happen, right?" He responded, "I didn't. He killed him and I guess he killed him right there on the spot."

(4) He was asked, "Who killed him, bro?" and "We're talking Bozo? Is that a 'yes,' Gilbert?" He responded, "Yeah."

(5) "And for reals if I am telling you guys I don't want Bozo to know cause . . . I gotta protect my family and shit, you know my little brother start riding and everything."

(6) "I was barely walking -- like, a few houses [¶] . . . [¶] [a]nd when that shit happens, I'm like, 'What the fuck?' And I just ran a little bit. And then I just -- 'cause I can't even run a lot, you know . . . [¶] . . . [¶] . . . 'cause my weight. [¶] . . . [¶] . . . And I just ran over, and I just like, 'Damn, fool just shot,' like, 'damn.' I seen what I seen."

The trial court also pressed the prosecutor to identify the inconsistent statements, and he pointed out the following (all errors in original):

(1) Mojica was asked, "How was it that you guys wound up there together, bro? How is that? How did that happen?" He responded, "He picked me up and shit. And the car -- we parked, like, on the block and shit. We're right there kicking it. He didn't told me shit. You know where shit, fuck we gonna be able to park." He was asked, "Where

---

**7** For clarity, we quote the transcript of the interview rather than the trial transcript because some of the statements were not precisely quoted during the hearing.

14

was the car parked, bro?" He responded, "Right there by 72nd, right in front of the apartment" and "A couple, few houses away, you know."

(2) When asked, "When do you know that he's got a gun in the car?," he responded, "I never seen it. That's why I tripped out like, 'What the fuck?'"

(3) "He just, like, 'Let's take a walk fool. Let's go see the apartments.' All right. We got out of the car, and then we were right there. And then I started tying my shoelaces . . . just started walking, tying my shoe. And then I just heard, like, 'Hey,' 'Where you from?' and he was on one. And he knew he didn't bang." He was asked, "[S]o you saw him approach the guys on the stairs?" He responded, "[H]e know he didn't bang . . . ." He was asked, "[S]o, he knew it was Dominique? He knew he didn't bang?" He responded, "He knew he didn't bang, but I guess he was just so fucking that way, he fuckin' -- 'cause he's stupid."

(4) He said he was "maybe, 20 feet, 30 feet" away when he heard the shot.

The prosecutor also identified statements he believed were both consistent and inconsistent with Mojica's trial testimony (all errors in original):

(1) He was asked, "Okay, you see him go up to these vatos and ask 'em where they're from; is that right? Is that a 'yes'?" He responded, "Yeah."

(2) He was asked, "And you saw him say what?" He responded, "He like, 'Where you from?' And then I just heard them say, 'I don't bang.' I'm like, What? (Inaudible) give me your iPod. And then like, What. I don't know how he knew they had an iPod cause by the time that was already getting over when I heard the shot, when I was tying my shoe, by the time -- that shit happened, like, everything, like, I was -- (inaudible), you know."

The trial court took the matter under submission and ultimately overruled the defense objections, permitting the prosecution to call Detective Ramirez and play the redacted recording for the jury. The redacted recording and transcript were admitted into evidence.

*B. Analysis*

Appellant concedes the redacted recording and transcript of Mojica's interview were admissible as either prior consistent or inconsistent statements.  (Evid. Code, §§ 770, 791, 1235, 1236;[8] see *People v. Homick* (2012) 55 Cal.4th 816C.M., 859 [prior inconsistent statements]; *People v. Riccardi* (2012) 54 Cal.4th 758C.M., 802 [prior consistent statements].)  So appellant argues the interview excerpts were cumulative, unnecessary, and risked confusing the jury in light of CALCRIM No. 318, an instruction read to the jury.  This is essentially an argument that the trial court abused its discretion in finding this evidence admissible under Evidence Code section 352.[9]  We "'will not disturb a trial court's exercise of discretion under Evidence Code section 352 unless it is shown the trial court exercised its discretion "'in an arbitrary, capricious or patently

---

[8]     Evidence Code section 1236 states, "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with [Evidence Code] Section 791."  Evidence Code section 791 states in relevant part, "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: [¶] . . . [¶] (b)  An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."  Evidence Code section 1235 states, "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with [Evidence Code] Section 770."  Evidence Code section 770 states, "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a)  The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or  [¶]  (b)  The witness has not been excused from giving further testimony in the action."

[9]     Evidence Code section 352 states, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

16

absurd manner.'" [Citations.]' [Citation.]" (*Homick, supra*, at p. 865.) Appellant has not shown an abuse of discretion here.

Appellant first argues admission of Mojica's prior consistent statements was unnecessary because, although those statements rebutted defense counsel's suggestion that Mojica fabricated his trial testimony in light of his plea deal, it did not rebut defense counsel's other suggestion that Mojica also had a motive to lie to officers in light of his arrest itself.[10] We cannot see why a secondary attack on Mojica's credibility would render the prior consistent statements unnecessary to rebut defense counsel's primary attack. Indeed, "a prior consistent statement is admissible as long as the statement is made before the existence of *any one of the motives* that the opposing party expressly or impliedly suggests may have influenced the witness's testimony." (*People v. Noguera* (1992) 4 Cal.4th 599C.M., 629 (*Noguera*), italics added.) The prosecutor could have reasonably concluded defense counsel's primary attack based on the plea deal was a serious threat to Mojica's credibility and it was well within the trial court's discretion to allow the prosecutor to introduce the interview excerpts to rebut that attack.

Appellant next cites *Noguera* to argue that so many details in Mojica's interview differed from his trial testimony that the interview had no "corroborative and rehabilitative potential." *Noguera*, however, did not address the degree to which the details of the prior and current statements must be consistent in order for the prior statement to be admissible; the court simply found the recording and transcript of a witness's prior interview corroborated the "origin and details" of a conspiracy to commit murder and "tended to reinforce in the jurors' minds the impression that [the witness] was truthful." (*Noguera, supra*, 4 Cal.4th at p. 628.) Here, Mojica's interview corroborated his trial testimony on the key issue in the case: appellant shot Dunn. Beyond that, it was hardly unusual that a prior statement by an accomplice-turned-prosecution-witness

_____

**10**      We assume, without deciding, defense counsel's cross-examination in fact implied Mojica had a motive to lie based on his arrest itself, although the portions of the record appellant cites are far from clear on the point.

17

contained both consistencies and inconsistencies, and the degree to which those points undermined or rehabilitated his credibility was a matter properly left to the jury.

Appellant argues the admission of Mojica's prior inconsistent statements was unnecessary because Mojica acknowledged at trial that his previous account of the shooting differed from his current account. While conceding Mojica's interview was indeed cumulative of his trial testimony, the Attorney General argues playing the interview was nevertheless necessary for several reasons: it provided "context" for Mojica's earlier story; it would have been difficult to edit the transcript and recording to eliminate all the inconsistent statements but preserve the consistent statements; and the jury was entitled to hear Mojica's own voice giving the false account during his interview to weigh his credibility.

We need not decide whether these reasons justified introducing Mojica's prior inconsistent statements because we can identify no conceivable prejudice from their admission under either *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) (harmless beyond a reasonable doubt) or *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) (reasonable probability of a more favorable outcome). As appellant acknowledges, the inconsistencies were already presented to the jury through Mojica's trial testimony, none of which involved material points, as appellant himself acknowledges. Perhaps more to the point, Mojica's prior inconsistent statements undermined his credibility, so having them repeated for the jury by way of his interview served only to benefit appellant. Thus, the outcome would not have differed had the trial court excluded the interview.

Finally, appellant contends the interview should have been excluded because it likely confused the jury when it applied CALCRIM No. 318, which instructed the jury as follows: "You have heard evidence of statements that a witness made before the trial. If you decide that the witness made those statements, you may use those statements in two ways: one, to evaluate whether the witness' testimony in court is believable; and two, as evidence that the information in those earlier statements is true." Appellant has not challenged the substance of this instruction, and we find no possibility the jury was

18

confused in using it to evaluate Mojica's interview. There was nothing particularly complicated about the consistencies and inconsistencies between Mojica's trial testimony and his statements during the interview, or the testimony from any other witness, and nothing in the record suggests the jury had any trouble evaluating Mojica's credibility and the truthfulness of his prior statements. As appellant aptly notes, "it is hardly uncommon for evidence of this nature to present jurors with complex credibility choices," especially in gang cases in which witnesses might fear for their safety. There is no basis to suspect the jury was confused by the trial court's admission of Mojica's interview.

### 2. *Count Two: Attempted Voluntary Manslaughter Instruction*

Appellant contends the trial court violated his state and federal constitutional rights by refusing to give an attempted voluntary manslaughter instruction for count two. We disagree.

For count two, defense counsel requested CALCRIM No. 604, which would have instructed the jury on attempted voluntary manslaughter based on imperfect self-defense, a lesser included offense of attempted murder. He argued appellant testified he had "panicked" due to the prior attacks on him and had "react[ed] to an environment where he thought he was in danger." According to defense counsel, "the testimony shows that he had been severely beaten in the past; that he had been subject to a variety of attacks; and that the environment in the county jail was one where both guards and inmates . . . were setting people up. That in the week just prior to this, there had been gang or racial violence. [I]t would suffice to create the environment in which voluntary manslaughter instruction would be allowed."

The prosecutor responded the evidence did not support the instruction because appellant "walked in, lights were out, and that there is no sudden quarrel. There is no defending himself. It's just him walking in -- as per him, he panicked and started stabbing Dominic Walker."

The court refused to give the instruction, reasoning that it "requires evidence that the defendant believed that he was in imminent danger of being killed or suffering great

19

bodily injury. And there is nothing to support that element of it. He said he was afraid, but we don't know what he was afraid of, or what he thought was going to happen to him. Because he didn't say that. He was very vague on that part." The court noted appellant used the word "panicked," but "that's totally different from believing he's in imminent danger of death or great bodily injury."

"'"The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request."' [Citation.] 'Conversely, even on request, the court "has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction."' [Citation.] This substantial evidence requirement is not satisfied by '"*any* evidence . . . no matter how weak,"' but rather by evidence from which a jury composed of reasonable persons could conclude 'that the lesser offense, but not the greater, was committed.' [Citation.] 'On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense.' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680C.M., 704-705.)

A jury may convict a defendant of voluntary manslaughter based on imperfect self-defense "'"when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury . . . ." [Citation.]'" (*People v. Manriquez* (2005) 37 Cal.4th 547C.M., 581 (*Manriquez*).) This theory "'requires without exception that the defendant must have had an *actual* belief in the need for self-defense'" and "'[f]ear of future harm -- no matter how great the fear and no matter how great the likelihood of the harm -- will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury. "'[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*"'"'" (*Ibid.*)

Although appellant testified that prior attacks and incidents made him paranoid and he "panicked" when he saw Walker in the shower, appellant offered no evidence he actually feared an *imminent* attack from Walker when he and Rivera entered the shower.

20

(*Manriquez, supra*, 37 Cal.4th at p. 582.) Walker was alone in the shower and apparently unarmed, and there was no evidence Walker did anything to suggest he was about to attack appellant. To the contrary, uncontroverted facts demonstrated a brutal, coordinated attack by appellant and Rivera, with assistance from Mejia locking inmate Harbin in the 2400 tier module, followed by appellant's attempt to dispose of the weapons, all against a backdrop of racial tensions between Southsider gang members and African-American inmates. Even if appellant had actually believed he might be attacked at some point in the future, nothing in this record suggests he was faced with an "'"'*imminent peril . . . that, from appearances, must be instantly dealt with.*'"'" (*Id.* at p. 581.) The trial court did not err in refusing to give the attempted voluntary manslaughter instruction.

### 3. Count Two: Prosecutorial Misconduct

Appellant contends the prosecutor committed misconduct by asking him on cross-examination whether he was aware of a "kite," or note, passed between inmates that gave a "green light" on Walker.[11] Appellant has forfeited the argument, and even if not, we reject it.

During cross-examination, the prosecutor and appellant had the following exchange:

"Q    Were you aware that there was a kite that was passed between Southsider inmates that gave a green light on Scrilla [i.e., Walker]?

"A    I wasn't aware of that.

"Q    Is that news to you?

"A    That's news.

"Q    Isn't it true that you as a Southsider knew that there was a green light on Dominique [*sic*] Walker?"

---

[11]    The prosecution's gang expert witness explained to the jury a "green light" means "someone is marked for death" and that "[t]here will be messages sent within the jail, typically, that someone is no good. There is a green light on someone, and that it's okay for that person to be hit wherever that person is at."

At that point defense counsel objected and asked to approach the bench. At sidebar, he argued appellant already answered he was not aware of the kite and argued this line of questioning was irrelevant. The prosecutor responded he had "a right to ask him . . . what he knows. He says it was just a shock that this guy was in the shower, and he just overreacted, when there is evidence to the contrary." The court asked the prosecutor how far he would delve into the topic, and the prosecutor said, "He's denying it. So that's all I'm doing. I'm questioning him and moving on." The court said, "Okay," and defense counsel said, "Okay. Well, whatever."

Back on the record, the prosecutor resumed the questioning briefly:

"Q      Let me ask you, Mr. Guerrero, you were aware that there was a green light on Scrilla; isn't that true?

"A      I wasn't.

"Q      I'm sorry?

"A      I wasn't.

"Q      As a Southsider, you have no idea that that was -- that was set; right? Is that what you're saying?

"A      That's exactly what I'm saying."

A prosecutor commits misconduct in violation of the federal Constitution when he or she engages in conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process. (*People v. Fuiava* (2012) 53 Cal.4th 622C.M., 679 (*Fuiava*).) Under state law, a prosecutor commits misconduct if he or she uses deceptive or reprehensible methods to attempt to persuade either the court or the jury. (*Ibid.*) Because the single instance of prosecutorial misconduct alleged in this case was not so egregious it violated due process, we must determine if it was reasonably probable a result more favorable to the defendant would have resulted absent the misconduct. (*People v. Bordelon* (2008) 162 Cal.App.4th 1311C.M., 1323-1324, citing *Watson, supra*, 46 Cal.2d at p. 836.)

"A defendant generally ""may not complain on appeal of prosecutorial misconduct unless in a timely fashion -- and on the same ground -- the defendant made an

assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]'" [Citation.]' [Citation.]" (*Fuiava, supra*, 53 Cal.4th at p. 679.) The failure to timely object may be excused if objecting would have been futile or a jury admonition would not have cured the harm caused by the misconduct. (*Ibid.*)

Appellant has forfeited his misconduct challenge by not objecting to the prosecutor's line of questioning on the basis of misconduct, or at the very least, on the basis that the prosecutor did not have the evidence to support his questions. (See *People v. Young* (2005) 34 Cal.4th 1149, 1186 (*Young*) [finding no forfeiture of misconduct claim based on prosecutor's questions when defendant objected that the questions were irrelevant in the absence of evidence to substantiate them].) Contrary to appellant's suggestion, defense counsel's relevance objection did not alert the trial court to this specific issue; defense counsel merely complained appellant had already answered the questions by denying any knowledge of a "kite" putting a "green light" on Walker.

We also disagree with appellant that the trial court prevented defense counsel from fully articulating his objection when the discussion of the issue concluded on defense counsel's comment, "Okay. Well, whatever." Defense counsel had ample opportunity to object that the prosecutor lacked a good faith basis for his line of questioning, and had he done so, we have little doubt the trial court could have addressed the issue and properly admonished the jury.

In any case, appellant's claim fails on the merits. He is correct that "a prosecutor may not '"ask questions of a witness that suggest facts harmful to a defendant, absent a good faith belief that such facts exist."'" (*Young, supra*, 34 Cal.4th at p. 1186.) As noted above, the prosecutor argued appellant "says it was just a shock that this guy was in the shower, and he just overreacted, when *there is evidence to the contrary*." (Italics added.) Although that ambiguous statement alone did not necessarily mean the prosecutor had specific evidence a "kite" existed that put a "green light" on Walker, appellant never requested further elaboration or an offer of proof. Not having done so, he cannot now complain the statement was too vague to demonstrate the prosecutor's good faith belief.

23

Appellant relies on *People v. Wagner* (1975) 13 Cal.3d 612C.M. and *People v. Evans* (1952) 39 Cal.2d 242C.M., but both cases are inapposite. "In *Wagner*, the prosecutor failed to make an offer of proof or to introduce any evidence to substantiate the implications from his questions that the defendant, who was charged with selling marijuana, had been involved in extensive drug sales. (*Wagner*, at pp. 616-619.) In *Evans*, the prosecutor, without any evidentiary support, improperly asked the defendant a series of questions insinuating the defendant accosted and molested a girl in a park. (*Evans*, at pp. 247-249.)" (*Young, supra*, 34 Cal.4th at p. 1186.) Here, by contrast, the prosecutor indicated he had evidence to substantiate his questioning, and without a request by defense counsel to elaborate, that was enough to provide a good faith basis for the questions.

Even if the prosecutor's questioning had amounted to misconduct, appellant cannot show prejudice under either the *Chapman* or *Watson* standards. The exchange was only a small part of the trial proceedings (less than one page of the lengthy trial transcript) and did not imply appellant had originated the "kite" that put a "green light" on Walker, but only that appellant might have known one existed. And the existence of a "kite" would have been at best cumulative of the significant evidence that the attack on Walker was coordinated and planned. Under these circumstances, appellant would not have obtained a more favorable outcome absent the alleged misconduct.

## 4. Count Two: Great Bodily Injury Enhancement

Appellant contends his state and federal constitutional rights were violated because insufficient evidence supported the jury's finding that he inflicted great bodily injury on Walker as required for the enhancement under section 12022.7, subdivision (a). We disagree.

Section 12022.7, subdivision (a) states, "Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years." "Great bodily injury" is defined as "a significant or substantial physical injury" (§ 12022.7, subd. (f)), which requires

24

"substantial injury *beyond* that inherent in the offense," but not "'permanent,' 'prolonged' or 'protracted' disfigurement, impairment, or loss of bodily function" (*People v. Escobar* (1992) 3 Cal.4th 740, 746, 750 (*Escobar*); see *People v. Cross* (2008) 45 Cal.4th 58, 64). "Proof that a victim's bodily injury is 'great' -- that is, significant or substantial within the meaning of section 12022.7 -- is commonly established by evidence of the severity of the victim's physical injury, the resulting pain, or the medical care required to treat or repair the injury." (*Cross, supra,* at p. 66.) This is an issue of fact that we review for substantial evidence, and we must accept the jury's determination even if the circumstances might reasonably be reconciled with a contrary finding. (*Escobar, supra*, at p. 750; *People v. Le* (2006) 137 Cal.App.4th 54C.M., 59 (*Le*).)

The evidence readily supported the jury's finding Walker suffered great bodily injury under section 12022.7. He had been stabbed multiple times with prison-made shanks, one at least five inches long, and he appeared to be in excruciating pain and had blood on different parts of his body immediately after the attack. Upon examination, deputies observed he had suffered six or seven wounds to his back, three to five wounds to his chest, and two wounds to his arms and shoulders. He had difficulty breathing and his eyes were glazed. He had to be taken to the hospital and treated.

Walker's injuries fell well within the universe of similar injuries courts have found constituted great bodily injury. (*Escobar, supra*, 3 Cal.4th at p. 750 [extensive bruises and abrasions, neck pain, and vaginal soreness impairing victim's ability to walk]; *Le, supra*, 137 Cal.App.4th at p. 59 [soft tissue damage from a gunshot rendering the victim "unable to walk, stand, or sit unassisted for weeks"]; *People v. Bustos* (1994) 23 Cal.App.4th 1747C.M., 1755 [multiple abrasions, lacerations, and contusions]; *People v. Harvey* (1992) 7 Cal.App.4th 823C.M., 827-828 [blistering second degree burns with visible discoloration and disfigurement for at least a month requiring repeated medical treatments]; *People v. Muniz* (1989) 213 Cal.App.3d 1508C.M., 1520 [bruised and swollen eye, loss of consciousness, and severe blows that "'felt like splinters going through [victim's] skull'"]; *People v. Sanchez* (1982) 131 Cal.App.3d 718C.M., 733 [multiple abrasions, lacerations, bruises, and swelling]; *People v. Jaramillo* (1979) 98

Cal.App.3d 830C.M., 836 [multiple contusions, swelling, and sever discoloration painful to the touch and visible a day later].)

Although appellant cites Walker's medical records to question the severity of Walker's injuries, he is essentially urging us to reweigh the evidence, which we cannot do. Nor are we persuaded by his reliance on *People v. Martinez* (1985) 171 Cal.App.3d 727C.M., the only case he cites finding evidence insufficient to demonstrate great bodily injury. It involved only a minor laceration inflicted on the victim through two shirts and a heavy coat, and it did not require the victim to be taken to the hospital. (*Id.* at p. 735.) The prosecutor had even agreed the injury did not satisfy section 12022.7 and asked the allegation be stricken. (*Martinez*, at pp. 735-736.) Here, in sharp contrast, Walker was stabbed multiple times, appeared to be in excruciating pain, and had to be taken to the hospital.[12] Sufficient evidence supported the jury's finding that the great bodily injury requirement of section 12022.7, subdivision (a) had been met.

### 5. Incorrect Court Operations Fee

The oral pronouncement of judgment, the sentencing minutes, and the abstract of judgment reflect the trial court imposed a $200 court operations fee on each count, for a total fee of $400, pursuant to section 1465.8, subdivision (a)(1). Appellant contends this was error and the maximum statutory fee was $40 per count, for a total of $80. The Attorney General agrees, as do we. (§ 1465.8, subd. (a)(1) ["To assist in funding court operations, an assessment of forty dollars ($40) shall be imposed on every conviction for a criminal offense," with certain exceptions not pertinent here]; *People v. Sencion* (2012) 211 Cal.App.4th 480C.M., 483-484 [separate court operations fee imposed on each

---

[12]   Appellant also cites *People v. Covino* (1980) 100 Cal.App.3d 660C.M., in which the court suggested in dicta that the victim appeared not to suffer great bodily injury based on a "momentary interruption of breathing and slight reddening of the skin without any substantial damage to bodily tissues." (*Id.* at p. 667.) But the case did not involve section 12022.7; it involved assault by force likely to produce great bodily injury under section 245, subdivision (a), which does not require any injury at all. (*Covino*, at p. 667.) In any case, Walker's injuries easily surpassed those inflicted on the victim in *Covino*.

26

count].)  Therefore, we will modify the judgment to reflect the proper court operations fee of $80.

## DISPOSITION

The judgment is modified to impose the correct court operations fee of $80. (§ 1465.8, subd. (a)(1).)  The clerk of the superior court is ordered to issue an amended abstract of judgment reflecting the correct court operations fee and forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

In all other respects, the judgment is affirmed.

FLIER, J.

WE CONCUR:

BIGELOW, P. J.

RUBIN, J.

27